Thank you. May it please the Court, my name is Don Schott. It's my pleasure to represent Mr. Charles Posnanski in these three consolidated appeals. There are a number of issues raised by these appeals, and what I would like to do is skip a little bit and go right to the third argument or the third issue raised in our appeal, which is whether or not the Arizona District Court judge erred in his application of the Arizona statute of limitations to this case. I realize that I'm skipping over some issues, but I want to focus on that issue because I think it's a very important issue in the case, and frankly, if I prevail on that issue, many of the other issues go away. That issue really turns, I believe, on the interpretation of two letters that were written in March of the year 2000. My client, Mr. Posnanski's March 18, 2000 letter and the March 20 response from the defendant, Mr. Gibney. And the two issues that are raised by those two letters are the question of whether or not the cause of action should be deemed to have accrued under Arizona law, whether Mr. Posnanski had discovered enough information about his potential claim that the cause of action accrued under the discovery rule, number one, and number two, whether the doctrine of equitable estoppel should apply. And the fact is those two letters and those two doctrines and those two concepts are very interrelated in a case like this where you're dealing with a claim against a professional where there was clearly a fiduciary trusting relationship between the parties. Counsel, just so I can follow your argument. Now, your argument is going to whether or not the court erred in applying the Arizona statute of limitations. My argument goes to whether or not the court erred in the way it applied the Arizona statute of limitations. For these purposes, I'm skipping over the first part of my argument, and if I have time, I will go back to it, about whether the Arizona statute of limitations is the correct one or not. But for purposes of this discussion, then, you're assuming that the Arizona statute of limitations applies. That's correct, Your Honor. Thank you for clarifying. You just want to know when it starts. When it starts, exactly. When did the cause of action accrue? And I think it's important to talk a little bit about the factual context, and I want to do it specifically with the reference to one of the particular investments, Mr. Posnansky's investment in a startup company called NCC. What Mr. Posnansky knew at the time that he wrote his March 18, 2000 letter is that because Mr. Gibney had brought this investment to his attention, he had invested over a million dollars in this startup company called NCC. He knew that Mr. Gibney had drafted a contract for him that would give some restrictions on how NCC could use that money in order to protect Mr. Posnansky's interest, and he knew that he had a recent conversation with the head of NCC who told him that the investment wasn't going well, the company wasn't doing well, and there was some chance that his investment would not turn out to be a good investment. That's all that he knew. What he did not know at that time were the facts that were relating to Mr. Gibney's violations of what we believe were his duties to Mr. Posnansky. He did not know that at the time Mr. Gibney had recommended the investment to Mr. Posnansky, Mr. Gibney was the lawyer for NCC, was owed money by NCC for legal services he had provided, and he had an understanding from NCC that if an investor came in and invested money in NCC, Mr. Gibney would get a $25,000 retainer from NCC. None of that was known by Mr. Posnansky when he wrote his letter. When did the NCC investment take place? In April of 1998. Ninety-eight. So it was two years before this letter was sent. Yes. And what you're arguing is that do I understand correctly what you want us to go through each investment and see when it starts? I don't think that's necessary. All that is necessary is, I think, to look at the analysis that Judge Sedgwick did in Arizona, where he said by March 20th it was clear that Mr. Posnansky's cause of action had accrued. Yes, based upon the March 18th letter. Based upon the March 18th letter. And why — what is the — what happened in 98, what he knew there, how is that going to show that Judge Sedgwick was wrong? Because I think the key element of all this, Your Honor, is what Mr. Posnansky knew is that his investment was going downhill. He didn't know the relationship between Mr. Gibney's conduct and the fact that he should have never gotten into this investment to begin with. Why would he ask for Gibney's insurer and why would he ask for information on the State Bar? That's not the kind of thing that you ordinarily inquire if what you are doing is saying, hey, maybe I need to move this money someplace else, this is going down the tubes. You don't usually ask for your insurance information and particularly the information at the State Bar. But if you look at the letter, that's a very good observation, but if you look at the letter he's also asking for information for the Better Business Bureau, all sorts of information. Other things that would indicate that he was preparing to file some kind of a complaint, whether it was a legal complaint, but he was prepared to file some kind of complaint. And a complaint to the Attorney General is a complaint to the Better Business Bureau, but those are all directed to Gibney personally, not to NCC, right? Has to be. Yes, they are directed to Gibney, but if you look at that letter in context, I think what he's saying is, I know something went wrong here, I am desperate, I have lost my life savings, I want to recover, and since you're the guy that got me into this, since you're the guy that gave me bad investment advice, what can you do for me? I want to know what my ability to recover from you might be. But it doesn't know about the facts and circumstances of how Mr. Gibney violated his duty. Does he have to know all the facts and circumstances for the statute of limitation run, or is he put on notice of facts he could find out if he pursued it? That is the question. He has to be put – he has to know enough that a reasonable person would do further investigation. So he has enough that he's asking for malpractice and insurance policies to cover him, and he wants information about reporting him to some ethical board, I suppose, at the bar. Isn't that pretty strong, that at that time he says there's something wrong and I should be reimbursed for your malpractice? No. I think what it shows is that he knows he has lost his money, and he is desperately looking out for some way that he can recover his money. I think it's very – excuse me. He's implying a charge of malpractice when he's saying you have a malpractice carrier. Do you have insurance? Why doesn't that go further than just I don't think maybe anything went wrong, but I'd like to find out why I lost $4 million? I think you're attributing a level of sophistication and detailed thinking to Mr. Posnansky that may be inappropriate in these circumstances. We all as lawyers understand that in order to have a claim against a lawyer under their malpractice policy, there has to be some type of allegation of negligence or intentional conduct. But if you look at the totality of Mr. Posnansky's letter, all he's saying in there is you gave me lousy investment advice. It was you that brought me to this investment, and it turned out to be terrible. But Mr. Posnansky is nobody's fool. This is a man who's been in the banking business for many, many years. He's got $4 million. This is not a trivial amount of money. And the questions that he's asking are not how are we going to get this money back. What can we do? It looks like the bottom is dropping out of the market. What have I got to do here to preserve my investment? Or is there misconduct on the part of NCC here that we ought to think about filing some kind of a, you know, a shareholder derivative suit or something else? This is all directed to Gibney's wrongdoing. And ordinarily, sophisticated people investing with brokers and others understand that if the stock goes down, they don't always have a cause of action against the broker. I think, again, if you look at the letter that he wrote, he doesn't say anything about your wrongdoing. He doesn't say anything in the letter about how you had some kind of conflict of interest, that you were doing something improper. If you were Mr. Gibney, how else could you take the reference to your malpractice insurer, the State Board, and the Better Business Bureau? If I were Mr. Gibney, who's behaved very badly here, by the way, apparently, I would be pretty nervous about that. That's not just a reflection on bad advice. That very well may be the case. That's not anything else very seriously wrong here. That very well may be the case. But the question is not how did Mr. Gibney take the letter. The question is, from Mr. Posnansky's standpoint, was he on notice of facts that gave rise, that had this cause of action begin to accrue? I think it's very similar to the case Walk v. Ring that we cited, a little different fact scenario, but that was the woman that went in to see her dentist, had some dental work done, and knew that the dental work came out terribly, and knew that at the same time that the dental work was being done, she started having terrible headaches and problems with her neck, went to see somebody else. And the Arizona Court of Appeals said in that situation, clearly she knew of her injury at that point, and she knew that it was somehow related to the fact that she was getting treatment from this dentist, but it wasn't until some other professional told her that the first dentist did something wrong, that he was negligent in the way he had done his work, that her cause of action accrued. And I think that's very much the case here with Mr. Posnansky. He knew he was injured. He knew something had gone wrong. He was searching out to see some way he could recover his money, but he didn't have the information about how Mr. Gibney had been giving him this advice and not telling him all the ways that Mr. Gibney and his friends and his family members and his associates were going to benefit from that advice. Counsel, what's our standard of review? Pardon? What is our standard of review? Since this came up on a motion for summary judgment, the standard of review is whether there is any evidence that would give rise to an indication that Mr. Posnansky has a triable issue on the statute of limitations. What's our standard of review on the determination of whether or not the statute of limitations, Arizona statute of limitations, is properly applied? I'm not sure I understand. Are you asking whether the Arizona statute of limitations is the correct statute to apply? No, your argument goes to whether or not the district court properly applied the Arizona statute of limitations vis-à-vis the accrual of a cause of action. What's our standard of review on that determination, understanding that the umbrella is a summary judgment, but what's our specific standard? That's de novo. De novo. De novo?  What's your case authority for that proposition that the plaintiff's knowledge of the circumstance is sufficient to put him on notice is de novo review? I believe we addressed that in our brief. But the question is, since it was a grant of summary judgment, whether or not you review the district court's determination of summary judgment. I understand. But when we review summary judgment adjudications, we also, under that umbrella, have to look at the standard of review for each one of the issues that goes into making up that summary judgment determination. So ‑‑ I'm sorry. Perhaps I misunderstood your question, then, Your Honor. Could you ‑‑ When we review a summary judgment determination, the overall review is de novo. But if there are parallel issues under there, we also look at the standard review for each of those issues. In this particular case, I'm asking you, what is the standard of review when we review a district court judge's determination regarding the accrual of a cause of action for purposes of the statute of limitations? I believe that is also, in this case, de novo review, Your Honor, because it's the question of whether or not a reasonable jury would have any evidence in which it could find that the statute of limitations had not yet accrued as of March 20th of 2000. I'm asking you, what case authority are you relying upon to make that assertion to us? The same case authority for the proposition that a review of summary judgment is de novo, because I think it's conceptually the same question. But you're not aware of any case that has addressed the issue of what the standard review is specifically for determining whether or not a district court has properly applied the statute of limitations in determining when a cause of action accrues. If we were not in the summary judgment context, if we were just addressing that issue, you're not aware of any case that sets forth a standard review for that? Not a different standard review than that. All right. Okay. The second part of the argument that I want to get into with respect to this question is not only the question of did the cause of action accrue at that point in time, but does the doctrine of equitable estoppel apply? Mr. Posnansky's letter is written on March 18th of 2000. Mr. Gibney responds two days later on March 20th, 2000, and says essentially, Chuck, don't do anything. I understand you're upset. I understand you're concerned about your loss of money. I'm handling it. There are things that I'm going to do. We're going to try to recover some money from here and there. You really don't have any recourse against me. Stay the course. Hold on. Don't do anything precipitous. It would only hurt me. It would only hurt you. Stay with me here. I'm going to make you better. I'm going to handle this. And he continues to write Mr. Posnansky letters like that for quite a period of time, and then when Mr. Posnansky finally runs out of patience, brings a lawsuit, he says, in essence, gotcha. You waited too long. You followed my advice. You did what I told you to do, which was stay the course, held on, didn't bring any cause of action, and now I'm going to take the position that you've run out of time, that the statute of limitations has expired, and you no longer can bring a claim against me. And I think if we allow an attorney in a situation like that to, in essence, get away with that, it sends a very terrible message to the public because it really is a case of gotcha. Mr. Posnansky still considered Mr. Gibney to be his attorney, was still relying on the advice he was getting from Mr. Gibney, and did exactly what Mr. Gibney asked him to do. He did not file a lawsuit. He did not pursue a claim. He waited to see. Was there anything else other than the March 20th letter that suggests that Gibney was begging off and telling him to hold off? What else is in the record? There is a whole series of letters written post-March 20th that are detailed in the briefs and in the other documents where he continued to correspond with Mr. Posnansky. In fact, there was a lawsuit that was brought against one of the ñ involving one of the investments, and there was a partial recovery by Mr. Posnansky on that. But Posnansky had two years from the time that he writes the March 18th letter to sort of figure out what's going on here and be within Arizona's statute of limitations. The fact that he files the complaint eight days late, unless your office practice is much quicker than most office practices, suggests that this thing was probably in the planning stages, the lawsuit was someplace in the planning stages before the Arizona statute of limitations would have expired, unless somebody drafted this very quickly over a one-week period. What's the problem? Well, the problem is that Mr. Posnansky did not get advice from any attorney other than Mr. Gibney until the statute of limitations was about to expire. And then, of course, you get into the whole questions of which statute of limitations really apply here. And it certainly is our position that the Arizona statute of limitations is not the correct statute of limitations. I know I haven't much time, but let me very briefly touch on what I think is the key issue there, which is the whole question of Mr. Posnansky's residency. And I think that's a term that we have to be very careful in using. Mr. Posnansky lived in Wisconsin. He lived in Wisconsin under very unusual circumstances. He was on supervised release because he had been incarcerated, and he was required to live in Wisconsin. What difference would it make between Wyoming and Wisconsin? In terms of the statute of limitations? Yeah. Wisconsin's statute of limitations is longer. Right. But what difference does it make whether he resides in Wisconsin or he resides in Wyoming? Because the borrowing statute, which is the statute Judge Sedgwick relied on to say Wisconsin statute of limitations doesn't apply, says Wisconsin statute does not apply to a foreign injury. And he said this must be a foreign injury because I'm not sure what Mr. Posnansky's connection was with Wisconsin. He wasn't a resident of Wisconsin. He was a resident of Wyoming. Well, he — I understood that by foreign injury that it meant that the cause of action accrued outside of Wisconsin. That's — and the question is, in a case where there's economic injury, where does that cause of action accrue? It's not like a personal injury case where it's clear, you know, a car accident case where the injury occurs where the car accident occurred. If Judge Sedgwick was applying Arizona's choice of law provision, is that correct? He was not. He was rejecting the application of Wisconsin's choice of law and said that the borrowing statute in Wisconsin meant he applied the Wisconsin borrowing statute to say that the Arizona law would apply. Which law provision applies? I believe Wisconsin's choice of law provision applies. Because this is a 1404 transfer? Yes. Okay. Now, if it's a 1404 transfer, then I'm sorry, then Wisconsin's choice of law provision applies. Right. If we apply Wisconsin's choice of law provisions, whose law applies? I believe Wisconsin law applies under the balancing of the various interests that are set forth in the Air Products case. And that was our argument in the district court. I guess if I can boil down my argument to one that at least makes sense to me as a father of college-age children, I have two kids that are in college, not in Wisconsin. They have bank accounts there. They are not considered residents of those states because the colleges want them to pay out-of-state tuition. They are considered, for tuition-paying purposes, residents of Wisconsin, even though they haven't been home more than four days in the last three years. But if they were economically harmed, somebody stole money out of their bank account or defrauded them in some way, their harm would occur where their bank, where they lived and where their bank account was, where their money was, where their financial assets were that were affected. It wouldn't occur in Wisconsin, even though that's where their residency is for purposes of determining what type of tuition payments they have to make. And that's really the situation we have here with Mr. Posnanski. He lived in Wisconsin. His accounts were in Wisconsin. His money was in Wisconsin. He sent that money to Arizona under false representations and with a breach of duty by Mr. Gibney. And I think that's where his injury occurred. So the Wisconsin borrowing statute does not apply. And in that case, we go to the choice-of-law analysis, and under that choice-of-law analysis, then the Wisconsin statute of limitations should apply. I know your time is up, but I have one question that I wanted to ask. I'm sensitive to the issue that there's an attorney-client relationship of some type here or some type of trust, whatever Mr. Gibney was acting as. And so the issue comes up with frauds and concealment. You only need eight days, and you're home free. But under the law, as I understand it, it isn't his keeping the cause of action away from the knowledge of your client, but keeping facts away from your client. What does the record show as to actively keeping facts away from your client by Mr. Gibney? That's an interesting question because all of these facts that I'm talking about with respect to the NCC investment, the fact that Mr. Gibney had an understanding that he would get paid, the fact that Mr. Gibney's wife got $75,000 out of this investment as part of her salary, Mr. Gibney didn't have to actively conceal that from Mr. Posnanski in the sense that Mr. Posnanski never had a reason to ask about it. So there wasn't active concealment in the sense that he lied in response to a direct question, that he altered documents or things like that. It was just there was no reason for Mr. Posnanski to suspect any of these things, which is why I think it fits in more with the equitable estoppel argument. But certainly it was concealed. Mr. Posnanski was not made aware of these facts. And if, to the extent that Mr. Gibney was acting as an attorney, he had an obligation certainly to do that. Okay. Thank you. Thank you.  Thank you, counsel. We'll give you one minute for rebuttal. If it please the Court, I am Russell Klingerman of Hinchon-Clobertson, and I represent the defendants, William Gibney and Gibney and Associates. We would like to start, as did Mr. Schott, with comments concerning the March 18, 2000, letter. We believe that Judge Sedgwick was correct when he decided, as a matter of law, that that letter shows accrual. Certainly you could have a case where there may be a question of fact of accrual, but you don't have a question of fact of accrual where the plaintiff writes to the defendant and says, you depleted my life earnings. He has language in his letter that says that Mr. Gibney made mistakes, that there have been debacles, that there are schemes that he's not happy with. He talks about misrepresentations made about the amount of risk associated with the subject investments. He goes on then to say, give me your malpractice insurer, contact information, give me the securities, the Better Business Bureau, and the bar. There is no question, we believe, for a jury to decide whether Mr. Posnanski had the necessary knowledge to have his cause of action accrue. We also believe that that letter, as Judge Sedgwick observed, takes fraudulent concealment out of the case. Under the Waugh case, you have to have – there is potential fraudulent concealment if the plaintiff does not have actual knowledge of possible negligence. If you look at the letter, as Judge Sedgwick did, there is certainly knowledge on Mr. Posnanski's part of the possibility of negligence. He wants malpractice insurance, he's talking about mistakes, he's talking about debacles, he's talking about schemes. He names Mike Davis. He names Bill Bradley. He names – he talks about these other people, but he doesn't care about them. He cares about Gibney and Gibney's misconduct. He knows he's been harmed, and he knows there is fault, and he knows there is a causal connection between them. He could have filed the same complaint he filed on March 26th of 2002 – or March 28th, March 26th – he could have filed that same complaint the next day. If you look at the complaint, the amended complaint, it talks about allegations that Mr. Gibney failed to give him proper information as to the risks of the investments and that – and concerning these conflicts with these other people, and that he failed to do things with his documents that would have protected his assets. Those are the exact same problems that he addresses in his March 18 letter. So we believe that there's no question about accrual. Ginsburg. Counsel, let me ask you this. If Mr. Gibney dissuaded Mr. Posnansky from pursuing a cause of action, how would that affect the statute of limitations analysis? Well, that's my next comment. That's the estoppel issue. We believe that in Arizona, the Nolde case is the case on point. It talks about estoppel by inducement to toll the running of the statute of limitations. In that case, the Court said that the Court must determine that the defendant's conduct was so severe as to cause duress that deprived the – a reasonable person, the plaintiff, of the freedom of will to file the lawsuit on time. There is nothing in the record that supports a conclusion, a prima facie case of duress, where freedom of will has been jeopardized by Mr. Gibney. In the Nolde case, it was a high school track coach who said, if you tell anybody about this, he had them to promise not to tell anybody about this. And he showed these students, these girls, 14, 15 years old, his gun. He – there was a – these students thought that their lives were in danger. The track coach suggested that he had killed one of their boyfriends, who did die under suspicious circumstances. These people – those students created by their briefing a question of fact as to whether there was duress. So the summary judgment decision on behalf of that track coach was reversed by the court of appeals. Here, there is no record like that. What the courts have said about estoppel and duress is that if you're simply denying the allegations, if you are giving factual updates, if you are – if you have a different opinion about whether your conduct was subject to – to valid criticism or not, that type of exchange of information does not create enough evidence to have the question of estoppel arise. And that is what we have here, and that's what Judge Sedgwick said. In the Nolde case, it says vague statements and ambiguous conduct will not create estoppel. In the Wack case, it talks about the denials or the Clark case's denial, where there's – if you deny it, that doesn't create an estoppel. And in the Wack case, it says if you differ – your opinion is different than your plaintiff-to-be's opinion. That is not estoppel, and that is what we have here. So we believe that we've got accrual, no fraudulent concealment, no estoppel under Arizona law. I'd like to comment on the choice of law question, but first I'll answer your question. Thank you. I understand your argument under Nolde, and it's persuasive, but I'm more concerned about the fraudulent concealment issue. I take it that you agree there was some type of relationship between these two of trusted confidence, whatever that was, whether it was lawyer, client, or investor, investee, or whatever. Now, the responsibility, as I understand it under Arizona law, is that Gibby cannot keep facts from the plaintiff, not knowledge of a cause of action, but he can't keep facts away. Now, the problem I'm having is that if you have – if you have a condition of trust and confidence, there may be a responsibility to you to give facts. That is, if I'm a lawyer and you're my client, it may be that I should tell you that I'm somehow related to the person you're suing, that there's a duty to come forward. There were a lot of things happening that the plaintiff didn't know about that Gibby knew about, that if he had disclosed, like some of the money that was going to his wife, et cetera, that that would have put him on at least greater notice. So what is the responsibility of Gibby about facts in his position when he has a position of trust and confidence with the plaintiff? Certainly, if this case would be tried, there would be evidence submitted as to who knew what when, but the question of accrual and whether accrual is delayed by fraudulent concealment is governed by the holding in the walk case, and it says that where there is actual knowledge of possible negligence, we don't have fraudulent concealment. And the walk case, as recognized by my esteemed opposing counsel, is not factually similar. In that case, the dentist knew that there was another dentist in town that had an opinion that what that first dentist did was wrong, and there is a failure to disclose that, as alleged in that case. Here, there's no evidence that Mr. Gibney was even on notice that what he did was wrong. And so when he – when there's a conflict as to whether he's right or wrong and he denies it, that doesn't toll the running of the statute as long as the plaintiff's knowledge. Accrual is all about what the plaintiff knows. It's not a question of whether Gibby's on notice. The question is, is whether if Gibby's relationship is one that he ought to divulge information, then he has a responsibility to divulge it. So we're talking about a two-year period. I understand what the district judge did with the letter, and I can understand your argument there. But there's another two years, and when there's this discussion of a person to whom you have a responsibility, is obviously looking in and concerned. Because of the trust relationship between Gibby and the plaintiff, at what point does it ever occur that Gibby has a responsibility to come forward with facts? That is, because he knows that the person who is in this trust relationship can use those facts. And if he did, in any of that two-year period, if he found out some of these really smoking guns, he may have filed that suit earlier. So where does this trust and confidence issue come up? Well, certainly, a lawyer has to decide day by day which disclosures are relevant or not. If the lawyer decides that there's no adversity between his interest and the interest of his client, under the ethical rules, there isn't even the trigger to make the disclosure. That whole mindset would have to be decided by, and there have been experts on both sides that have rendered opinions about whether those disclosures were necessary or not. But Mr. Posnansky said in his letter, in his first sentence, I had trust in you. He's saying my trust is gone. So once the he has recognized that there's no more trust or the trust has been jeopardized or put into play here, then he's got an obligation to file his lawsuit, do his discovery and take the case on to figure out. Let me see if I understand your argument. Are you saying that once his letter was filed, from that point on, Gibby is forgiven for any responsibility he has as a person involved in his trust and confidence relationship? No, I'm not saying that. I'm saying that in Posnansky's mind, he had enough doubt of possible negligence and that his interest may not have been pursued as diligently by Gibney as he wanted to do his inquiry and, if necessary, to file his lawsuit. It's that. And if there wasn't trust in relationship, I can understand that. But if there is this trust relationship, does Gibney ever get to the position in his two years, ever get to the position that he had a responsibility to come forward with certain facts because this person was in that relationship? Well, he the relationship was ongoing. The communications were ongoing. Right. Concealment would be you're concealing knowledge. What Posnansky did is acknowledged his knowledge. He recognized it, and he put it in writing. So there isn't concealment here. At that particular time, Gibney comes back and says, stay the course, we'll go ahead, and he subsides. Suppose he had known that there was money being funneled off and given to his wife. Suppose he was aware of these other facts. That might have triggered action on his part. And that's why it bothers me whether this relationship they had puts a different argument before us. I'm afraid that you've assumed that the rendition of the facts as asserted by Mr. Schott would actually be the only one and that it's undisputed. But, in fact, Mr. Posnansky went to Arizona and met with Mike Davis and Mr. Gibney and Mr. Gibney's wife, brought his own wife along in April of 98 and also again in April of 99. He had the private placement memorandum for NCC in his possession. So even before he wrote the letter, he was finding information, hearing information, doing his own diligence as to these investments. This information was available even before March 18. But certainly by March 18, he had the requisite knowledge of possible negligence to not have the statute of limitations toll for his benefit. And that's what fraudulent concealment is about. That's what the parallel doctrine of estoppel is about. It all focuses on what the plaintiff knew and did he know enough not to have the Arizona legislature statute of limitations apply to his cause of action. And we believe that on this record, you can't find anything else about it other than what Judge Sedgwick did, having studied it as he did. Now, as far as whether the Arizona statute of limitations applies, 1404 transfer, but it was transferred under circumstances where the effect was to cure a defect in jurisdiction. So he transferred under 1631. Pardon? Then why didn't the judge transfer it under 1631 instead of 1404? I don't know. He didn't say that. He said it was for the convenience of the parties. He said there might be a problem with personal jurisdiction. It looked like he wasn't reaching that problem. Well, I agree he didn't hold it. But we would think under Muldoon that the effect was to cure a potential defect. Well, it looks like it may have. But he transferred it under 1404, and there are very different choice of law consequences for whether he transfers it under 1404 or 1631. Well, we don't think that there are such serious differences. But, in fact, Judge Sedgwick decided not to side with us and follow the Muldoon approach and apply the Arizona statute of limitations. If the Arizona conflict analysis is applied, it's undisputed, there hasn't been or our position hasn't been challenged by our opponent, that the Arizona statute of limitations would apply if you go Muldoon. If you don't go Muldoon, if you go Ferens, which is more, I guess, conservative in that approach that what we were recommending wasn't followed, it just becomes more complicated. But all you do is you start in Wisconsin instead of starting in Arizona. And when you start in Wisconsin, you start with the Wisconsin borrowing statute. If it's a foreign cause of action, then you apply the statute of limitations from the foreign jurisdiction. If you have a map of the United States and you have to either decide where Givney or where Posnanski was harmed, his economic harm, or where the conduct that was the subject of his cause of action accrued, you put your thumbtack either in Arizona because that's where the conduct was, or you put the thumbtack in Wyoming because that's where the economic harm was. And why would Wyoming even be a consideration here? Because the statute says you have to. It says if it's a foreign cause of action, you adopt that. If it's short of the Wisconsin, you adopt it. Is it because he's domiciled in Wyoming? It's because his legal residence is Wyoming. He's judicially stopped from claiming any other residence. He was asked, state your name and address in the tax court in Florida, and he said, Charles Posnanski, Cheyenne, Wyoming. He told the- Right. That's his domicile. His residence, though, is in Wisconsin. No. His legal residence is Wyoming. He told the- Yes. All of his tax forms went to the IRS. He claims to have, quote, lived in Wisconsin. He claims that he had to live there because the supervisory release order from Judge Randa in the Eastern District of Wisconsin required it. We have submitted into record at our document number 25 the docket from the federal court, Judge Randa's criminal case, the supervisor- Counsel, there's a difference between legal domicile and residence. Do you understand that? Yes, I do. Okay. And you can have- It seems to me you can have a cause of action that will accrue at your residence that doesn't have anything to do with, for example, diversity jurisdiction. So for diversity purposes, he may be a resident of Wyoming. But that wouldn't have anything to do with whether this was a cause of action under Wisconsin law or whether it was a cause of action under Arizona law. But if you apply the barring statute, you have to figure out where his economic harm was. His economic harm was where he chose to have his economic home. And he chose, with volition and free will, to tell the IRS, to tell Judge Randa, to tell Judge Sedgwick, to tell Judge Chabot- Where was the bank? Was the bank account in Wyoming? Bank account in Wyoming. The address on the bank statement is Cheyenne- No, the bank account was in Wisconsin, M&I Bank in Wisconsin. But the address on the bank account was Cheyenne, Wyoming. But the bank was- What bank was it? It was M&I Bank. Which is from where? It's in Wisconsin. Oh, sorry. So it's a Wisconsin bank. So it's a Wisconsin bank account. Yeah, but the owner of the bank account was not a Wisconsin resident. No. He was a Wyoming resident, and the bank statements say, you know, he's a Cheyenne- So he told Gibney, he told his bank, he told the tax court, every IRS form that he filed ever since 1996, Judge Randa, Judge Chabot, Judge Sedgwick. He told all of them. He told the world, my residence, my economic home is Cheyenne, Wyoming, and I'm sticking to my guns. Only when we raised this issue of having a problem for this as far as the foreign cause of action, he said, oh, wait, but I live in Wisconsin. I live in Wisconsin because of the supervision placed on me by Judge Randa. In June of 1998, a year and three or four months after he got out of prison, the three-year supervisory period was lifted. He told the tax court, it's in our submissions in the record, in November of 1998, that he wants to have his trial on his tax liabilities handled in Tampa, Florida. As of June of 1998, just like Southwest Airlines, he was free to roam around the country. He bought property in Florida, and he moved there. His own affidavit said, after the supervision was released, I was released from the supervision. I set up a winter home in Florida. He misleads you to believe that that was a three-year period of time. He was in Florida in the winter of 1998. He was in Colorado in the summers. His economic home, that thumbtack, was in Wyoming. Yes, he did spend time in Wisconsin, but he was basically a tourist. He was a former resident. Under the Wisconsin Department of Revenue code here, he was a non-resident of Wisconsin, and it's in our document, in our materials. When you're a non-resident of Wisconsin, even if you have losses or earnings, they are not to be part of your Wisconsin financial package. They have to be accounted for in the jurisdiction where you have set up your residence, your economic home. That was Wyoming. He chose Wyoming because Wyoming didn't have an income tax. Now he wants to say, I lost money in Wisconsin, because it's more convenient for him. Once you decide where you're going to have your economic home, you should be obliged under the law to follow it. And when you do that, and you apply the Wisconsin Borrowing Statute, if you follow Terranova, the district court decision that says economic harm is significant for this decision, you end up in Wyoming two years. But if you do what Judge Sedgwick did, and we think you should, you don't, because this is economic harm. He followed the Risto case, the Wisconsin court case, not the Wisconsin Federal District Court case. And that says this type of claim, whether it be professional negligence or contract, how it's pled, we don't think it makes much of a difference, neither did Judge Sedgwick. He said where it's economic harm, the best test is the Risto test. You go to look where the conduct was. What conduct is at issue here? And the conduct at issue was all the conduct in Arizona that Mr. Posnanski was not happy with, and the Risto case takes you to Arizona and to the two-year Arizona statute of limitations. I notice my time is up. I apologize for going over. MS. POSNANSKI Thank you. I'd like to ask a question about the sanctions. Because I don't think we've got another round of, I think this is your opportunity. What is the issue that we need to decide on the sanctions? We believe that under the MacArthur case and the Chrysler case that the transfer should not have been partial. Judge Shabazz didn't want the case anymore. He should not have kept it. Why can't he keep matters of misconduct in his court? Because we believe that MacArthur and Chrysler say a transfer should be plenary, has to be plenary. You don't divide it. Why did you take that issue to the Seventh Circuit instead of to us? The Arizona court is only enforcing a judgment against your client in a Wisconsin court. Why isn't the question of the imposition of the judgment there a question for the Seventh Circuit, not a question for us? Once we believe the transfer did occur, the rest of the file did follow. Once you've got docket items 1 to 20. If there's an error here, I'm not sure it's curable by the district court in Arizona. The error then would be the district judge in Wisconsin, and we don't have any control over him. We think you have jurisdiction over all the decisions in the case and that we believe that that transfer was improper, that he didn't have jurisdiction to enter it. You should vacate it. We should vacate what? Vacate the sanctions order issued by Judge Shabazz because he didn't have jurisdiction to do it. Why wouldn't we vacate the transfer? Well, we don't think it would be appropriate to vacate the transfer. That's their first argument out of the box, and I actually struggled with that. And I was wondering how that might be handled by the panel here. They don't suggest a remedy. They say the transfer was improper, but they don't suggest a remedy. We do not believe that a retransfer is doable here, and we believe that it's been waived. If they wanted retransfer, if they wanted to have the ---- Right. But you're the ones who appealed the sanctions. Right. Because the transfer happened. We're not asking for a retransfer. Right. But if we didn't get the whole case, then maybe our remedy is to void the transfer and send it back to Wisconsin so that we can get all of this in one court. You have the whole case. You've got docket ---- We don't have. No, we don't have the matter of the sanctions, except as the district court in Arizona enforced a judgment issued in Wisconsin. We believe the review is appropriate, but if you disagree, then that's ---- we'll accept that decision by you. You don't want us to retransfer back to Wisconsin to try and straighten this out, then? We've not asked for that remedy. No, we have not. We believe it would be inappropriate to retransfer because they want the retransfer. They never asked for it. They should have asked Judge Sedgwick to do it. Then you'd have that motion denied before you. We don't believe it's appropriate. All right.  Thank you. We'll give you one minute for rebuttal, counsel. Just very briefly, I wanted to address the question of the borrowing statute, because I think there was some confusion on that. The Wisconsin borrowing statute, by its terms, does not say anything about residency or domicile or any of those terms. All the Wisconsin borrowing statute says is that if you have a foreign cause of action, then the applicable statute of limitations is the shorter of the statute of limitations where the foreign location where the cause of action accrued or the Wisconsin statute of limitations. And the statute does not give any further definition of foreign cause of action. And so that's ---- so the next question, then, is, is this a foreign cause of action or not? And although there was lots of allegations about what Mr. Posnanski said or didn't say or when he said it, there is no dispute here that every dime that is at issue in this case was money that was in Wisconsin and transferred from Wisconsin to Mr. Gibney's trust account in Arizona as a result of communications that occurred between Mr. Gibney and Mr. Posnanski when Mr. Posnanski was in Wisconsin. And for those reasons, I think this is not a foreign cause of action, and therefore the Wisconsin borrowing statute doesn't apply. Then you do a choice of law analysis under the Air Products case, and we believe under that analysis the Wisconsin statute of limitations applies. Thank you. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. This case is in ---- this court is in recess until tomorrow morning. All rise. This court is in recess until 9 a.m. tomorrow morning. Thank you.
judges: Wallace, Rawlinson, Bybee